**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

Judy Jackson-Pringle,

       *Plaintiff*,

    v.

Washington Metropolitan Area
Transit Authority,

       *Defendant*.

Case No.: 1:20-cv-01880-JDB

**PLAINTIFF'S OPPOSITION TO DEFENDANT WASHINGTON METROPOLITAN
AREA TRANSIT AUTHORITY'S MOTION FOR SUMMARY JUDGMENT**

Comes now the Plaintiff, by and through undersigned counsel, and, pursuant to LCvR

7(h)(1), submits the aforesaid Opposition with contained points and authorities, stating as

follows:

I.      <mark>**INTRODUCTION**</mark>

II.     **FACTS**

Plaintiff Dr. Jackson-Pringle began her employment with Defendant WMATA in April

2012.  *See* Exhibit A ("Deposition Transcript of Dr. Judy Jackson-Pringle") at pg. 10:18-20.  On

June 4, 2017, Plaintiff Judy Jackson-Pringle, PhD ("Dr. Jackson-Pringle") was subjected to a

hostile work environment by her supervisor, Defendant Washington Metropolitan Area Transit

Authority's ("WMATA") employee Bobby Gilchrist ("Gilchrist").  *See id*. at pg. 21:18-22:4,

137:1-10, 155:14-159:17; Exhibit B ("July 17, 2017, Formal Discrimination Complaint of Dr.

Judy Jackson-Pringle to WMATA Office of Civil Rights"); Exhibit C ("December 18, 2017,

Notice of Finding of Hostile Work Environment by WMATA Office of Equal Employment

Opportunity Director James Wynne"); *and* Exhibit D ("Deposition Transcript of James Wynne")

("Exhibit D") at pg. 18:5-19:3, 21:21-23:4.

Dr. Jackson-Pringle was subjected to a hostile work environment by Gilchrist because

Gilchrist walked in on Dr. Jackson-Pringle while she was in the women's bathroom and stared at

her while she was in a state of partial undress.  In her deposition, Dr. Jackson-Pringle described

what occurred as follows:

> Q Okay. And in the Complaint, it states
> that Mr. Gilchrist not only entered the ladies'
> room and was looking at you fully exposed, but
> that he stayed there for a period of time. Is
> that correct?
> A That's correct. He stayed there for
> about -- best guess is about two minutes, because
> it was so long that I started -- I was getting
> afraid because -- very afraid because he was
> standing there and he was just staring and I was
> pulling up my pants and I was trying to close the
> door at the same -- the door to the stall at the
> same time, so I had to let go of my pants because
> this is at night. No one's in that building
> except for the two of us. Anything can happen,
> and no one would even know that I'm there except
> for the guy that's on the phone and the young lady
> who knew that I was coming there because she was
> supposed to meet me there, but she wouldn't know
> that I was in the restroom because my car was
> outside. She probably thought I was upstairs.
> But I'm like, What was going on? He stood
> there entirely too long. I mean, if it's a
> mistake, then you know it as soon as you walk in.
> He should not have even made that -- you cannot
> make a mistake like that. You can't make the
> mistake.
> And you know you're in there when you see
> someone in there. If this is something that
> you're accustomed to using because no one's there,
> then as soon as you know someone's there, you turn
> around and you leave. He did not do that. He
> stood there and he was just staring at me. Oh, my
> God.

Exhibit A ("Deposition Transcript of Dr. Judy Jackson-Pringle") at pg. 156:22-158:11; *see also* Exhibit B ("July 17, 2017, Formal Discrimination Complaint of Dr. Judy Jackson-Pringle to WMATA Office of Civil Rights"); Exhibit C ("December 18, 2017, Notice of Finding of Hostile Work Environment by WMATA Office of Equal Employment Opportunity Director James Wynne"); Exhibit D ("Deposition Transcript of James Wynne") at pg. 22:5-12; *and* Exhibit E ("Deposition Transcript of Bobby Gilchrist") ("Exhibit E") at pg. 22:5-23:1, 24:19-20, 46:6-15. When Dr. Jackson-Pringle confronted Gilchrist about his inappropriate behavior, he laughed in her face.  *See* Exhibit A ("Deposition Transcript of Dr. Judy Jackson-Pringle") at pg. 188:6-12, 189:13-16; *and* Exhibit D ("Deposition Transcript of James Wynne") at pg. 22:5-12.

As a result of this incident with Gilchrist, Dr. Jackson-Pringle filed a formal complaint of sexual harassment with the WMATA Office of Civil Rights on July 17, 2017.  *See* Exhibit B ("July 17, 2017, Formal Discrimination Complaint of Dr. Judy Jackson-Pringle to WMATA Office of Civil Rights").  Dr. Jackson-Pringle's formal complaint resulted in a finding on December 18, 2017, that Gilchrist had subjected Dr. Jackson-Pringle to a hostile work environment, and which also resulted in Gilchrist, a supervisory employee, being disciplined. *See* Exhibit C ("December 18, 2017, Notice of Finding of Hostile Work Environment by WMATA Office of Equal Employment Opportunity Director James Wynne"); *and also* Exhibit E ("Deposition Transcript of Bobby Gilchrist") at pg. 15:6-8.

Though Defendant WMATA imposed some limited discipline on Gilchrist, Defendant WMATA left Gilchrist in a position of supervisory authority over Dr. Jackson-Pringle where she had to continue to interact with the very person who had subjected her to a sexually hostile work environment.  *See* Exhibit A ("Deposition Transcript of Dr. Judy Jackson-Pringle") at pg. 54:18-55:14.  Defendant WMATA did not even make Gilchrist take additional training on sexual

harassment or hostile work environment beyond the standard trainings received by all WMATA

supervisors.  *See* Exhibit E ("Deposition Transcript of Bobby Gilchrist") at pg. 16:19-17:5,

51:14-21.

Prior to her complaint against WMATA supervisor Gilchrist, Dr. Jackson-Pringle had

never had any disciplinary issues at WMATA.  *See* Exhibit A ("Deposition Transcript of Dr.

Judy Jackson-Pringle") at pg. 51:4-5.  After her complaint against WMATA supervisor Gilchrist

was sustained, Dr. Jackson-Pringle began being given tasks with unreasonable time-frames by

her supervisors and then received unjust discipline for failing to meet those unreasonable time-

frames.  In her deposition, Dr. Jackson-Pringle testified regarding the unjust assignments and

discipline as follows:

> The egregious work took place at Northern
> and then again at Andrews, where they gave me work
> that was impossible to complete because I don't
> see these people. I won't see these people.
> They're not there when I'm there.
> I have to go out of my way and I have to
> go out of my way and stay after my shift, or come
> in long before my shift, in order to catch these
> people, and I'm not paid for these things. They
> don't pay you for that.
> You just come in and then you -- because
> you're just trying to keep things at a certain
> level. You don't want things to get out of hand.
> You're just trying to be agreeable. You're just
> trying to be a team player. You're just trying to
> work with someone in order to keep things to a
> minimum.
> And you shouldn't have to do that, so when
> you're giving me work that's out of my hours,
> that's out of the range of my work hours, then
> that's a little impossible to do because if I come
> in at 11:00 and these people come in before I get
> there and they're off either before I -- the
> people come in early in the morning, they're off
> before I get there, or they're leaving when I'm
> coming, or they're there before I get there and I

have to wait hours or hours -- so after I get --
after I'm off I just have to sit around and wait
for them to get there and just, like, coach
them -- coax them into staying and going along
with and helping me. That's it? I mean, come on.
You can't -- that should not happen.
It's not like you don't know the hours
that I work, because you assigned the hours.
***
you're giving me work that takes about two to
three weeks to complete and you're telling me
to -- and you're asking me to complete it. You're
instructing me. You're giving me an instruction
telling me that I have to do this or -- within a
couple of days. Something.
No, you can't do it in a couple days. It
can't happen in a couple days.
***
Even if I completed it outside my shift, I
would have to stay there until, like -- I'm
getting off at 7:00. I would have to stay there,
like, several nights until 11:00 or 12:00 in order
to complete it, even if I stayed outside of my
shift. So I wasn't even going to do that.
But she gave you numerous, numerous
assignments: accidents, those performance
conversations. Ms. Burton gave everyone numerous
assignments outside -- she gave me numerous
assignments outside of my work, I mean, that were
just unreal.
And you would say to her -- she gave you
an accident that's -- she gave you an accident on
Monday that's due on Wednesday. Come on.

*Id*. at pg. 85:15-87:4, 88:2-9, 88:21-89:13; *see also id*. at pg. 69:8-70:12, 174:2-9, 205:14-21.

After her complaint against Gilchrist was sustained, Dr. Jackson-Pringle began having

her shifts moved around to accommodate a less experienced and younger male employee.  In her

deposition, Dr. Jackson-Pringle described this instance of retaliatory sex discrimination as

follows:

A With Mr. Hennigan. They changed my shift
to accommodate Mr. Hennigan. Okay? He had

5

less --
Q When you say "less time in grade," you
mean --
A He had just --
Q -- by a couple of weeks or something or
what?
A No. I had been there, like, two years,
and he was just coming in the door. So I had been
in the office for, like, two years.
Q Okay.
A Mr. Hennigan was coming in the door.
Q So would it be fair to say you had
seniority over him?
A Yes, I did.
Q And you would it be fair to say he had
less experience than you?
A He did.
Q And he was younger than you?
A Yes, he was.
Q How much younger?
A Lots. He was, like, at least ten to
fifteen years younger.

*Id*. at pg. 206:19-207:20.

After her complaint against Gilchrist was sustained, Dr. Jackson-Pringle was passed over

for a position at another bus depot (Central) in favor of a less qualified employee who did not

even meet the basic qualifications for the position.  In her deposition, Dr. Jackson-Pringle

testified regarding this retaliatory failure to promote/transfer as follows:

Q You also state that you were denied a
position that was offered to a younger male with
less experience?
A Yes.
Q What position was that?
A That was out of that department, because I
was trying to get off -- out of that department.
And I can't recall exactly what that was right now
offhand, but I do have it written down. But
offhand, I can't recall what it was.
And that's just -- even -- I mean, I just
applied for a -- to go to Central, and I never got
an interview. But they took a depot clerk. Are

you serious? And it's not like -- I mean, she
drove the bus and she was a depot clerk.
I've driven the bus. I was a street
supervisor. And the position requires you to have
supervisory experience. I was a depot -- I was
street supervisor, I was an office manager, and --
still? And then they ask you to have a degree, a
BS, and she doesn't have that, either.

*Id*. at pg. 208:14-209:12.

These instances of unjust and unreasonable conduct were ongoing as of two months after

June 2019, which is approximately August 2019:

Q You said "began to happen." When did they
begin to happen?
A When -- like, I had been to Andrews --
once I came to Andrews, like**, a couple of months
after I came. I came -- we came there in June of
'19**, so it began to happen before December.
Q Before December 2019?
A Yes.

*Id*. at pg. 39:21-40:6 (emphasis added).  This retaliatory conduct continued through at least June

2020, when Dr. Jackson-Pringle was retaliatorily suspended.  *See id*. at pg. 75:16-22.  The

retaliatory conduct to which Dr. Jackson-Pringle was subjected included WMATA supervisor

Letroy Baker giving Dr. Jackson-Pringle an unjust memorandum of unsatisfactory performance

on September 25, 2019.  *See id*. at pg. 101:21-102:4.  Prior to Dr. Jackson-Pringle's EEOC

Charge being sustained, Dr. Jackson Pringle had never been rated unsatisfactory.  In her

deposition, Dr. Jackson-Pringle testified as follows regarding her pre-EEOC Charge performance

evaluation history:

Q Okay. So, again, prior to you filing a
complaint of sexual harassment, do you recall
being evaluated as unsatisfactory?
A No.

*Id*. at pg. 212:8-11.

As a result of this unjust and discriminatory conduct against her by Defendant WMATA

supervisors, Dr. Judy Jackson made several phone calls to Defendant WMATA's Equal

Employment Opportunity office, whose process required her to call in order to make a complaint

against Defendant WMATA:

> Q Okay. You mentioned calling several
> times. Do you know who you called?
> A Well, I would call the office, and they
> would -- you leave a message, and someone would
> call you back. Because normally no one answers,
> but you just leave a message and someone will call
> you back.
> And I recall a female, and she said she
> was replacing someone. Because they replace
> people regularly, so you kind of lose track of
> who's there.
> Q Well, let's start here. You said
> "several." Do you -- this one call that you said
> you made and someone -- a female called you back,
> a woman called you back. Do you know her name?
> A No, I don't recall her name. No, I don't.
> Q Do you know when you made this phone call?
> A I believe it was in -- where was I? I
> believe I was at the -- I believe I was at
> Andrews, so it had to be somewhere between 2019
> and 2020.

*Id*. at pg. 23:19-24:17.  When Dr. Jackson-Pringle made her internal EEO complaints in 2019

and 2020, she specifically left a message that "I needed to speak with someone regarding some

behaviors that were going on."  *Id*. at pg. 25:10-11.  This led to a meeting with WMATA

supervisors in which Dr. Jackson-Pringle "broke it down when I spoke with them."  *Id*. at pg.

26:14.  Dr. Jackson-Pringle's explanation breaking down the discriminatory treatment she was

receiving included descriptions of sex based discrimination, and unjust discipline for refusing to

sign off on a report with inaccurate information.  *See id*. at pg. 25-38.

As a result of this unjust and unreasonable conduct against her by WMATA supervisors after her complaint against Gilchrist was sustained, Dr. Jackson-Pringle filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on December 9, 2019 ("EEOC Charge").  *See* Exhibit F ("Dr. Jackson-Pringle's EEOC Charge") ("Exhibit F"). Dr. Jackson-Pringle's EEOC Charge listed WMATA as the employer and checked the box for discrimination based on retaliation.  *See id.*  Dr. Jackson-Pringle's EEOC Charge also included sufficient facts to put WMATA on notice that she was also complaining of discrimination based on sex and age, since her EEOC Charge included references to being treated discriminatorily relative similarly situated "younger male" employees, as well as being subjected to "sexual harassment":

> MY SHIFT WAS CHANGED TO ACCOMMODATE **YOUNGER MALES** WITH LESS TIME IN GRADE.  I WAS DENIED A POSTION THAT WAS OFFERED TO A **YOUNGER MALE** WITH LESS EXPERIENCE. . . .  I BELIEVE I HAVE BEEN RETALIATED AGAINST BECAUSE I FILED A **SEXUAL HARASSMENT** INTERNAL COMPLAINT.

*See id.* (emphasis added).

Despite Dr. Jackson-Pringle's active charge of discrimination before the EEOC, Defendant WMATA continued to subject her to discriminatory and retaliatory behavior.  This discriminatory and retaliatory behavior included giving Dr. Jackson-Pringle another unjust memorandum of unsatisfactory performance and being suspended in June 2020 for responding to an email communication in person as opposed to by reply email.  *See* Exhibit A ("Deposition Transcript of Dr. Judy Jackson-Pringle") at pg. 75:16-22, 116:10-117:20.  Because the retaliatory conduct against Dr. Jackson-Pringle continued into 2020, Dr. Jackson-Pringle also made additional calls in 2020 to the EEOC to attempt to complain of the discrimination she was receiving and file charges.  *See id.* at pg. 166:9-168:7, 182:10-184:22.  Thus, at all times,

Defendant WMATA was aware of the unlawful behavior it was subjecting Dr. Jackson-Pringle to.

## III.   POINTS AND AUTHORITIES

### A.   Summary Judgment Should Not Be Granted Where There Exist Genuine Disputes about Material Fact.

The standard for a grant of summary judgment is contained in Fed. R. Civ. P. 56. *See* Rule 56. Summary judgment should not be granted where, as here, there exist genuine disputes of material fact and the movant is not entitled to judgment as a matter of law. *See* Rule 56(a).

### B.   Defendant WMATA Is Not Entitled to Summary Judgment on Counts I and II of Plaintiff Dr. Jackson-Pringle's Complaint because Plaintiff Timely Filed Her EEOC Charge within 180 Days of Various Instances of Discriminatory Conduct, and because that Discriminatory Conduct Continued Even after Plaintiff Filed Her EEOC Charge.

Title VII of the 1964 Civil Rights Act ("Title VII") bans discrimination in the workplace based on sex. *See* 42 U.S.C. § 2000e-2(a)(1) ("It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin"). Title VII of the 1964 Civil Rights Act also bans discrimination against an employee who has opposed unlawful discrimination in the workplace, whether formally or informally. *See* 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."). Plaintiff Dr. Jackson-Pringle has sued Defendant WMATA for unlawful sex

discrimination (Count I) and retaliation for engaging in protected activity (Count II) under Title VII of the Civil Rights Act of 1964 ("Title VII"). *See* ECF 1 at para. 43-57.

Before a plaintiff may file a lawsuit in federal court under Title VII, she must first file a charge of discrimination before the EEOC. *See* 42 U.S.C. § 2000e-5(e)(1). Pursuant to Title VII, a charge of discrimination "shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred." *Id*; *see also Oviedo v. WMATA*, 299 F. Supp. 3d 50, 57 (D.D.C. 2018), *aff'd sub nom. Oviedo v. Washington Metro. Area Transit Auth*., 948 F.3d 386 (D.C. Cir. 2020) ("In the case of WMATA, "an aggrieved party must exhaust his administrative remedies by filing a charge of discrimination with the EEOC within 180 days of the alleged discriminatory incident.""").

Dr. Jackson-Pringle filed her charge of discrimination alleging retaliation on December 9, 2019. *See* Exhibit F ("Dr. Jackson-Pringle's EEOC Charge"). One hundred and eighty days prior to December 9, 2019, is June 12, 2019. That means that all instances of discrimination suffered by Dr. Jackson-Pringle between June 12 and December 9, 2019, are actionable.

In her deposition in this matter, Dr. Jackson-Pringle testified that she was being subjected to discriminatory and retaliatory conduct in approximately August 2019, two months after she arrived at a new WMATA station in June 2019:

> Q You said "began to happen." When did they
> begin to happen?
> A When -- like, I had been to Andrews --
> once I came to Andrews, like**, a couple of months
> after I came. I came -- we came there in June of
> '19**, so it began to happen before December.
> Q Before December 2019?
> A Yes.

*Id*. at pg. 39:21-40:6 (emphasis added). The discriminatory and retaliatory conduct to which Dr. Jackson-Pringle was subjected by Defendant WMATA between August and December 2019

included WMATA supervisor Letroy Baker giving Dr. Jackson-Pringle an unjust memorandum of unsatisfactory performance on September 25, 2019.  *See id.* at pg. 101:21-102:4.

The discriminatory and retaliatory conduct to which Dr. Jackson-Pringle was subjected by Defendant WMATA between August and December 2019 included discrimination based on sex:

> But they had a male working there and they
> felt that the male should be -- to me it felt that
> the male should be given privileges over me that
> they should -- they came in after me, but they
> should come before me. They were doing things
> with the male and, you know, changing my shifts to
> accommodate him.
> And, you know, it was just getting a
> little crazy about then, so -- and then you're not
> -- you're telling me you're doing it just because
> you can?

*Id.* at pg. 25:18-26:6.

The discriminatory and retaliatory conduct to which Dr. Jackson-Pringle was subjected by Defendant WMATA between August and December 2019 included being given discipline for refusing to sign a report Dr. Jackson-Pringle had not drafted and also that contained incorrect information:

> A We talked about what it was that I had
> called about. I think when Ms. -- when I spoke
> with Ms. Proctor, it was that I was -- I had
> written up some paperwork, and someone told me
> that they were -- you know, they said it was --
> that they were going to -- they didn't agree with
> the way that it had been written, so they were
> going to rewrite it.
> **And so that's not how we do things. You
> don't rewrite it if you don't -- you know, if you
> think something needs to be corrected, then you
> say it needs to be corrected and someone corrects
> it**. But they went home and they rewrote this
> entire paperwork **and they put incorrect**

**information on it and they wanted me to sign it.
I'm not doing that.**

*Id*. at pg. 29:8-30:1 (emphasis added).

The discriminatory and retaliatory conduct to which Dr. Jackson-Pringle was subjected

by Defendant WMATA between August and December 2019 also included being given

egregious work assignments that could not be completed in the time assigned, resulting in

discipline:

> the egregious work took place at Northern
> and then again at Andrews, where they gave me work
> that was impossible to complete because I don't
> see these people. I won't see these people.
> They're not there when I'm there.
> I have to go out of my way and I have to
> go out of my way and stay after my shift, or come
> in long before my shift, in order to catch these
> people, and I'm not paid for these things. They
> don't pay you for that.
> You just come in and then you -- because
> you're just trying to keep things at a certain
> level. You don't want things to get out of hand.
> You're just trying to be agreeable. You're just
> trying to be a team player. You're just trying to
> work with someone in order to keep things to a
> minimum.
> And you shouldn't have to do that, so when
> you're giving me work that's out of my hours,
> that's out of the range of my work hours, then
> that's a little impossible to do because if I come
> in at 11:00 and these people come in before I get
> there and they're off either before I -- the
> people come in early in the morning, they're off
> before I get there, or they're leaving when I'm
> coming, or they're there before I get there and I
> have to wait hours or hours -- so after I get --
> after I'm off I just have to sit around and wait
> for them to get there and just, like, coach
> them -- coax them into staying and going along
> with and helping me. That's it? I mean, come on.
> You can't -- that should not happen.
> It's not like you don't know the hours

that I work, because you assigned the hours.
***
you're giving me work that takes about two to
three weeks to complete and you're telling me
to -- and you're asking me to complete it. You're
instructing me. You're giving me an instruction
telling me that I have to do this or -- within a
couple of days. Something.
No, you can't do it in a couple days. It
can't happen in a couple days.
***
Even if I completed it outside my shift, I
would have to stay there until, like -- I'm
getting off at 7:00. I would have to stay there,
like, several nights until 11:00 or 12:00 in order
to complete it, even if I stayed outside of my
shift. So I wasn't even going to do that.
But she gave you numerous, numerous
assignments: accidents, those performance
conversations. Ms. Burton gave everyone numerous
assignments outside -- she gave me numerous
assignments outside of my work, I mean, that were
just unreal.
And you would say to her -- she gave you
an accident that's -- she gave you an accident on
Monday that's due on Wednesday. Come on.

*Id*. at pg. 85:15-87:4, 88:2-9, 88:21-89:13.

The discriminatory treatment Defendant WMATA subjected Dr. Jackson-Pringle to

between August and December 2019 "be[came] consistent.  You know, it was all the time."  *Id*.

at pg. 33:22-34:1.  This means that Dr. Jackson-Pringle was consistently being targeted with

discriminatory and retaliatory treatment by Defendant WMATA supervisors during a period,

August to December 2019, that fell entirely within the one hundred and eighty day period

preceding Dr. Jackson-Pringle's filing of her EEOC charge on December 9, 2019.  *See* 42 U.S.C.

§ 2000e-5(e)(1).  Accordingly, Dr. Jackson-Pringle's December 9, 2019, encompass various and

consistent acts of discrimination and retaliation by Defendant WMATA and was therefore

timely.

Additionally, Dr. Jackson-Pringle's December 9, 2019, EEOC Charge, which encompassed the period between June 12 and December 9, 2019, made clear that she was making claims of retaliation during that period, since the retaliation box on the form is checked off.  *See* Exhibit F ("Dr. Jackson-Pringle's EEOC Charge").  Dr. Jackson-Pringle's December 9, 2019, EEOC Charge also made clear that she was making claims of discrimination based on unjust work assignments and discipline ("I WAS BEING GIVEN EGREGIOUS WORTK THAT RESPONDENT KNEW IT WAS IMPOSSIBLE TO COMPLETE.  I WAS WRITTEN UP FOR THE EGREGIOUS WORK."), and sex ("MY SHIFT WAS CHANGED TO ACCOMMODATE YOUNGER **MALES** WITH LESS TIME IN GRADE.  I WAS DENIED A POSTION THAT WAS OFFERED TO A YOUNGER **MALE** WITH LESS EXPERIENCE.").  *See id.* (bolded emphasis added).

As the United States District Court of Appeals for the District of Columbia long ago explained, "At a minimum, the Title VII claims [in a lawsuit] must arise from "the administrative investigation that can reasonably be expected to follow the charge of discrimination.""  *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995).  In other words, Title VII claims in a complaint must bear a reasonable relation to the claims in the EEOC charge.  *See id.*  This standard has obviously been met here because Dr. Jackson-Pringle has pleaded sex discrimination (Count I) and retaliation (Count II) in her Complaint, and her EEOC Charge specifically mentioned both retaliation and discrimination based on sex, meaning any administrative investigation that would have reasonably followed would have explored sex discrimination and retaliation.  Accordingly, Plaintiff's Count I and II for sex discrimination and retaliation under Title VII are not simply reasonably related, but are exactly and directly related

to the information stated in her EEOC Charge, and which would have been investigated by the EEOC.

Without ground, Defendant WMATA has moved for summary judgment in this matter, mistakenly alleging that Dr. Jackson-Pringle's December 9, 2019, EEOC charge was untimely, and that her sex discrimination and retaliation claims under Title VII are therefore barred for failure to exhaust administrative remedies by filing a timely charge.  *See* ECF 18 at Memorandum of Points and Authorities, pg. 3-4.  Defendant WMATA is clearly mistaken.

Dr. Jackson-Pringle's December 9, 2019, EEOC charge timely encompassed all unlawful conduct by WMATA during the one hundred and eighty days between June 12 and December 9, 2019.  Dr. Jackson-Pringle's December 9, 2019, mentions retaliation, unjust work assignments and discipline, as well as discrimination based on sex.  *See* Exhibit F ("Dr. Jackson-Pringle's EEOC Charge").  The unlawful conduct described in Dr. Jackson-Pringle's EEOC Charge occurred between August and December 2019.  *See* Exhibit A ("Deposition Transcript of Dr. Judy Jackson-Pringle") at pg. 39:21-40:6.  Accordingly, the unlawful conduct described in Dr. Jackson-Pringle's EEOC Charge all occurred within the 180-day period stretching from June 12 to December 9, 2019, and thus Dr. Jackson-Pringle's EEOC charge was timely and her subsequent Title VII claims in this lawsuit are clearly not barred for failure to exhaust administrative remedies by filing a timely charge.

Defendant WMATA also mistakenly argues that no acts of sex discrimination are encompassed in the 180-days preceding Dr. Jackson-Pringle's EEOC charge and that on this basis her count for sex discrimination (Count I) may allegedly be ruled upon as a matter of law. Defendant is mistaken, and Dr. Jackson-Pringle has clearly adduced evidence of being treated differently than male employees sufficient to create a genuine dispute of material fact that does

not entitle Defendant WMATA to summary judgment as a matter of law on Dr. Jackson-Pringle's sex discrimination count.

In a footnote, perhaps because they are neither serious nor persuasive points, Defendant WMATA argues that Dr. Jackson-Pringle failed to file her lawsuit within 90 days of receiving an unsigned and undated, and therefore unexecuted, Right to Sue letter from the EEOC prior to a properly executed notice being issued.  *See* ECF 18 at Memorandum of Points and Authorities, n. 2.  A right to sue notice is a prerequisite of filing a lawsuit in federal court pursuant to Title VII and grants a plaintiff 90 days to do so.  *See* 42 U.S.C. § 2000e-5(f)(1).  Defendant WMATA mistakenly cites two cases in which parties received fully executed right to sue notices but failed to file a lawsuit within 90 days to mistakenly argue a properly executed right to sue notice is not required.  *See Deskins v. Barry*, 729 F.Supp. 1 at pg. 2; *and Crane v. National Cable Satellite Corp.*, 484 F.Supp.2d 100 at pg. 101 (D.D.C. 2007).  Neither case cited deals with an unsigned and undated notice of right to sue, but only properly executed right to sue notices that were not timely complied with.  Since that is not what occurred here, and since an undated and unsigned notice has not clearly been issued by the signatory authority, the cases cited by Defendant WMATA have no application to the present facts.  Dr. Jackson-Pringle timely filed her lawsuit after receiving a properly executed right to sue notice.  If it was the case that no executed notice was required, then the EEOC would not have issued a properly executed notice after Dr. Jackson-Pringle alerted them of the deficiencies in the notice she received.  Instead, the EEOC would have simply explained that the previous notice was valid.  For all the aforesaid reasons, Plaintiff's compliance with the properly executed 90 day notice makes her suit timely. Accordingly, Defendant WMATA's Motion for Summary Judgement should be denied.

Also in a footnote, Defendant WMATA mistakenly argues it is entitled to summary judgment on the basis that there is a time gap between Dr. Jackson-Pringle's protected activity (her sexual harassment complaint against Gilchrist) and Defendant WMATA's retaliatory conduct which allegedly breaks causation.  *See* ECF 18 at Memorandum of Points and Authorities, n. 3.  On this question, however, there is clearly a genuine dispute of material fact since Dr. Jackson testified she never had any disciplinary or other issues until she had testified against Gilchrist:

> nothing ever happened before
> that. I was fine before that, so I basically
> believe that it was, because I didn't have any
> problems before that.

Exhibit A ("Deposition Transcript of Dr. Judy Jackson-Pringle") at pg. 51:2-5; *see also id.* at pg. 14:20-15:4.  Accordingly, since there is a genuine issue of material fact as to whether Defendant WMATA's retaliatory conduct began after Dr. Jackson-Pringle's successful complaint against Gilchrist, Defendant WMATA is not entitled to summary judgment with respect to Dr. Jackson-Pringle's Title VII retaliation claim.

For all the aforesaid reasons, Defendant WMATA's Motion for Summary Judgment on Dr. Jackson-Pringle's should be denied.

      **C.**      **Count III of Plaintiff Dr. Jackson-Pringle's**
                  **Complaint for Hostile Work Environment**
                  <u>**Should Be Allowed to Proceed Pursuant to Title VII.**</u>

Defendant's Motion for Summary Judgment alleges that Dr. Jackson-Pringle's claim for hostile work environment in Count III is not cognizable pursuant to 42 U.S.C. § 1983, under which Count III is pleaded.  *See* ECF 18 at Memorandum of Points and Authorities, pg. 6. Defendant is not mistaken that hostile work environment is not cognizable pursuant to 42 U.S.C.

§ 1983 in this instance, but Defendant fails to acknowledge that a hostile work environment claim is cognizable under Title VII. *See Wade v. D.C*., 780 F. Supp. 2d 1, 18 (D.D.C. 2011) ("Title VII makes it unlawful for an employer to "requir[e] people to work in a discriminatorily hostile or abusive environment.""). Under Title VII:

> To establish a prima facie hostile work environment claim, a plaintiff must demonstrate (1) that he is a member of a protected class, (2) that he was subject to unwelcome harassment, (3) that the harassment occurred because of his race or gender, (4) that he was subject to unwelcome harassment, [*sic*] (4) that the harassment affected a term, condition, or privilege of employment, and (5) that the employer knew or should have known of the harassment, and failed to act to prevent it.

*Wade v. D.C*., 780 F. Supp. 2d 1, 18 (D.D.C. 2011).

Here, Dr. Jackson-Pringle is clearly a member of a protected class as a woman. Dr. Jackson-Pringle was subjected to unwelcome harassment when her supervisor Gilchrist walked in on her while she was in the women's bathroom, lingered and stared, and later laughed about the episode. *See especially* Exhibit C ("December 18, 2017, Notice of Finding of Hostile Work Environment by WMATA Office of Equal Employment Opportunity Director James Wynne"). The episode was investigated by Defendant WMATA itself and it was determined that Dr. Jackson-Pringle was subjected to a sexually hostile work environment. *See id*. Accordingly, Dr. Jackson-Pringle, a member of a protected class, was subjected to unwelcome harassment because of her gender, satisfying the first three prongs of a hostile work environment claim under Title VII. It is also clear that Dr. Jackson-Pringle has satisfied the fifth prong, demonstrating knowledge of the employer of the unlawful harassment.

Despite determining that Gilchrist had created a sexually hostile work environment for Dr. Jackson-Pringle, Defendant WMATA left Gilchrist in a position of supervisory authority over Dr. Jackson-Pringle where she had to continue to interact with and be evaluated by a person

who had subjected her to a sexually hostile work environment.  *See* Exhibit A ("Deposition Transcript of Dr. Judy Jackson-Pringle") at pg. 54:18-55:14.  Thus, Defendant WMATA knew Gilchrist had subjected Dr. Jackson-Pringle to a sexually hostile work environment and then allowed Gilchrist to remain in a position of authority over Dr. Jackson-Pringle, including allowing Gilchrist to evaluate someone he had previously subjected to a sexually hostile work environment.  Thus, and since evaluations are implicated and fair evaluations are a term or condition of employment, the unwelcome harassment in this instance impacted a term or condition of Dr. Jackson-Pringle's employment and was known to Defendant WMATA, the remaining prongs of a hostile work environment claim under Title VII.  Accordingly, this honorable Court should allow Dr. Jackson-Pringle's hostile work environment claim to proceed pursuant to Title VII.  Should the Court require it, Dr. Jackson-Pringle would amend the current pleadings to document the change.

For all the aforesaid reasons Defendant WMATA's Motion for Summary Judgment should be denied.

## IV.   <u>CONCLUSION</u>

For all the aforesaid reasons, Defendant WMATA's Motion for Summary Judgment should be denied.

Respectfully submitted,

Tucker Moore Group, LLP

            /s/ *Charles Tucker Jr.*
Charles Tucker, Jr. (Bar no. 993515)
charles@tuckerlawgroupllp.com
8181 Professional Place, Suite 207
Hyattsville, MD 20785
T: (301) 577-1175
F: (240) 467-5787
charles@tuckerlawgroupllp.com

*Counsel for Plaintiff*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of January, 2022, I caused a copy of the foregoing to

be filed via the Court's electronic filing system, which makes service on all parties so entitled.


_____*/s/ Charles Tucker Jr.*_____
Charles Tucker Jr.